Present:  All the Justices

MIR AIMAL KASI

OPINION BY JUSTICE A. CHRISTIAN COMPTON

v.  Record Nos. 980797          November 6, 1998
            980798

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
J. Howe Brown, Judge

On Monday, January 25, 1993, near 8:00 a.m., a number of automobiles were stopped in two north-bound, left-turn lanes on Route 123 in Fairfax County at the main entrance to the headquarters of the Central Intelligence Agency (CIA).  The vehicle operators had stopped for a red traffic light and were waiting to turn into the entrance.

At the same time, a lone gunman emerged from another vehicle, which he had stopped behind the automobiles.  The gunman, armed with an AK-47 assault rifle, proceeded to move among the automobiles firing the weapon into them.  Within a few seconds, Frank Darling and Lansing Bennett were killed and Nicholas Starr, Calvin Morgan, and Stephen Williams were wounded by the gunshots.  All the victims were CIA employees and were operators of separate automobiles.  The gunman, later identified as defendant Mir Aimal Kasi, also known as Mir Aimal Kansi, fled the scene.

At this time, defendant, a native of Pakistan, was residing in an apartment in Reston with a friend, Zahed Mir.  Defendant

was employed as a driver for a local courier service and was familiar with the area surrounding the CIA entrance.

The day after the shootings, defendant returned to Pakistan. Two days later, Mir reported to the police that defendant was a "missing person."

On February 8, 1993, the police searched Mir's apartment and discovered the weapon used in the shootings as well as other property of defendant. Defendant had purchased the weapon in Fairfax County three days prior to commission of the crimes.

On February 16, 1993, defendant was indicted for the following offenses arising from the events of January 25th: Capital murder of Darling as part of the same act that killed Bennett, Code § 18.2-31(7); murder of Bennett, Code § 18.2-32; malicious woundings of Starr, Morgan, and Williams, Code § 18.2-51; and five charges of using a firearm in commission of the foregoing felonies, Code § 18.2-53.1.

Nearly four and one-half years later, on June 15, 1997, agents of the Federal Bureau of Investigation (FBI) apprehended defendant in a hotel room in Pakistan. Defendant had been travelling in Afghanistan during the entire period, except for brief visits to Pakistan.

On June 17, 1997, defendant was flown from Pakistan to Fairfax County in the custody of FBI agents. During the flight, after signing a written rights waiver form, defendant gave an

2

oral and written confession of the crimes to FBI agent Bradley J. Garrett.

Following 15 pretrial hearings, defendant was tried by a single jury during ten days in November 1997 upon his plea of not guilty to the indictments. The jury found defendant guilty of all charges and, during the second phase of the bifurcated capital proceeding, fixed defendant's punishment at death based upon the vileness predicate of the capital murder sentencing statute, Code § 19.2-264.4.

On February 4, 1998, after three post-trial hearings, during one of which the trial court considered a probation officer's report, the court sentenced defendant to death for the capital murder. Also, the court sentenced defendant to the following punishment in accord with the jury's verdict: For the first-degree murder of Bennett, life imprisonment and a $100,000 fine; for each of the malicious woundings, 20 years' imprisonment and a $100,000 fine; and for the firearms charges, two years in prison for one charge and four years in prison for each of the remaining four charges.

The death sentence is before us for automatic review under former Code § 17-110.1(A) (now § 17.1-313(A)), see Rule 5:22, and we have consolidated this review with defendant's appeal of the capital murder conviction. Former Code § 17-110.1(F) (now § 17.1-313(F)). In addition, by order entered April 23, 1998, we

3

certified from the Court of Appeals of Virginia to this Court the record in the noncapital convictions (Record No. 980798). That record consists only of three notices of appeal from the conviction order. No other effort has been made to perfect the noncapital appeals; therefore, those convictions will be affirmed and we shall not address them further.

In the capital murder appeal, we will consider, as required by statute, not only the trial errors enumerated by the defendant but also whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the sentence is disproportionate to the penalty imposed in similar cases. Former Code § 17-110.1(C) (now § 17.1-313(C)).

At the outset, we will discuss the number, nature, and legitimacy of many issues raised by defendant. He assigned 92 errors allegedly committed by the trial court (placing 91 in his opening brief) and has not argued many of them (Nos. 8, 14, 15, 17, 18, 20, 21, 25, 26, 28, 32, 45, 47, 52, 61, 69, 72, 77, 78, 80, 89, 91 and 92); hence, they are waived and will not be considered. Jenkins v. Commonwealth, 244 Va. 445, 451, 423 S.E.2d 360, 364 (1992), cert. denied, 507 U.S. 1036 (1993).

In addition, defendant has effectively presented no meaningful argument in support of many assignments that are actually briefed. We have considered these so-called arguments

4

and find no merit in any of them.  Weeks v. Commonwealth, 248 Va. 460, 465, 450 S.E.2d 379, 383 (1994), cert. denied, 516 U.S. 829 (1995).  In this category are assignments 2, 5, 16, 19, 22, 23, 24, 29, 30, 33, 43, 51, 54, 73, and 87.

Also, other errors alleged (Nos. 6, 39, and 64) raise issues we previously have decided adversely to the argument defendant makes, and those decisions will not be revisited here.  Typical of this group is assignment of error 39:  "The Circuit Court erred in denying the defendant's motion to declare the Virginia death penalty statute unconstitutional."

Finally, from our study of this entire record, including the 4,903-page appendix, we have determined that many assignments of error that are argued in depth are devoid of any merit whatever. These are:  Nos. 1, 3, 7, 9, 10, 27, 31, 34, 37, 38, 40, 41, 42, 44, 46, 48, 49, 62, 63, 65, 67, 68, 71, 74, 75, 76, 79, and 88. This group requires no extended analysis and mainly raises issues involving the exercise of discretion by the trial judge on subjects such as continuances, pretrial publicity, discovery, and appointment or disqualification of counsel.  Typical of this group is assignment of error 49:  "The Circuit Court erred in denying defendant's motions for a continuance filed on August 11, 1997, and October 1, and October 8."  We have considered this entire group of alleged errors and reject them without any further discussion.

The remaining 23 assignments of error raise issues, inter alia, regarding defendant's apprehension, his confession, suppression of evidence, jury selection, and juror conduct. There is no conflict in the evidence relating to any of the facts presented during the guilt phase of this trial; the defendant presented no evidence.

Near 4:00 a.m. on June 15, 1997, Agent Garrett and three other armed FBI agents, dressed in "native clothing," apprehended defendant in a hotel room in Pakistan. Defendant responded to a knock on the room's door and the agents rushed inside. Defendant, who has "a master's degree in English," immediately began screaming in a foreign language and refused to identify himself. After a few minutes, defendant was subdued, handcuffed, and gagged. Garrett identified him through the use of fingerprints. During the scuffle, defendant sustained "minor lacerations" to his arm and back.

When the agents left the hotel with defendant in custody, he was handcuffed and shackled, and a hood had been placed over his head. He was transported in a vehicle for about an hour to board an airplane. During the trip, Garrett told defendant he was an FBI agent.

The ensuing flight lasted "a little over an hour." After the plane landed, defendant was transferred to a vehicle and driven for about 40 minutes to a "holding facility" where he was

6

turned over to Pakistani authorities.  The FBI agents removed defendant's handcuffs, shackles, and hood when the group arrived at the holding facility, but the persons in charge of the facility put other handcuffs on him.  Defendant was placed in one of the eight cells in the facility, where he remained until the morning of June 17.

During defendant's stay in the facility, the FBI agents never left his presence or allowed him to be interrogated or "harassed."  He was allowed to eat, drink, and sleep.  On two occasions, the agents removed defendant from his cell to "look at his back and look at his arm" and to take his blood pressure and pulse.  The agents did not interrogate defendant in the holding facility and made certain he was treated "fairly and humanely."

On June 16, "late in the day," Garrett was advised by an official at the U. S. Embassy in Pakistan that defendant would be "released" the next morning.  On June 17 near 7:00 a.m., defendant "was allowed to be released" from the facility in the custody of the FBI agents.  He was handcuffed, shackled, and hooded during a 15-minute ride to an airplane.  Once on the plane, the hood was removed.  Shortly after boarding the aircraft, a physician checked defendant's "well being."

During the 12-hour flight to Fairfax County, Garrett first conducted a "background" conversation with defendant, discussing "his life in the United States, where he lived, where he worked."

7

Garrett knew, from his four-and-one-half-year search for defendant, that he was a Pakistani national.  Defendant was not a U.S. citizen and he had not returned to the United States after he fled on January 26, 1993.

After the background conversation, Garrett advised defendant of rights according to Miranda v. Arizona, 384 U.S. 436 (1966).  Defendant signed an FBI "Advice of Rights" form, after reading it and having it explained to him.  He indicated he was waiving his rights and was willing to give a statement.  The subsequent interview lasted about one and one-half hours before defendant signed a written statement summarizing the interview.

In the written statement, defendant confirmed he purchased the AK-47 rifle and about 150 rounds of ammunition several days before the incident in question.  He said he drove his pickup truck to the scene, "got out of my vehicle & started shooting into vehicles stopped at a red light."  Continuing, he stated that "I shot approximately 10 rounds shooting 5 people.  I aimed for the chest area of the people I shot.  I then returned to my truck & drove back to my apartment."  He also stated that "several days before the shooting I decided to do the shooting at the CIA or the Israeli Embassy but decided to shoot at the CIA because it was easier because CIA officials are not armed."

As part of his oral statement to Garrett, defendant enumerated political reasons "why he wanted to do this shooting."

8

He said he was "upset" because U.S. aircraft had attacked parts of Iraq, he was "upset with the CIA because of their involvement in Muslim countries," and he was concerned with "killing of Pakistanians by U.S. components." When Garrett asked defendant "why he stopped shooting," he replied "there wasn't anybody else left to shoot." When asked about the gender of those shot, defendant replied "that he only shot males because it would be against his religion to shoot females."

On appeal, defendant mounts several constitutional and other attacks upon the trial court's refusal to suppress and the court's admission in evidence of defendant's statement to Garrett. First, defendant claims the statement was involuntary and was obtained through coercion. We do not agree.

The evidence on the issue, presented both at a pretrial suppression hearing and during the guilt phase of the trial, was overwhelming and uncontradicted that defendant validly waived any constitutional rights he may have had in connection with the statement and that the statement was voluntary. No threats or promises were made to defendant, either when he was apprehended or aboard the aircraft, and he was not offered anything in return for his statement. Defendant, who "had good command of the English language," told Garrett that he "understood his rights fully and completely." He never refused to answer any question, and at no time during the 12-hour return flight did he express

9

any fear or indicate he was making a statement because he was afraid.  There is no evidence of coercion while he was detained in Pakistan.  Indeed, the FBI agents were careful to assure he was treated humanely.  The trial court's detailed findings of fact that the waiver was knowing, voluntary, and intelligent and that the statement was voluntary are fully supported by the record.  See Roach v. Commonwealth, 251 Va. 324, 340-41, 468 S.E.2d 98, 108, cert. denied, 519 U.S. 951 (1996).

Next, defendant, attacking the jurisdiction of the trial court, contends that "either the Extradition Treaty between the United States and Pakistan or the Vienna Convention for Consular Relations were violated" requiring "sanctions" to be imposed for these alleged violations.  He argues the "abduction/seizure of Kasi was conducted outside and in express violation of the Extradition Treaty between the United States and Pakistan and without invoking the procedures set out by the laws of each country" and was contrary to law.  He says the "sanction" for violation of the treaty should be reversal of the capital murder conviction and "repatriation to Pakistan without prejudice for a new trial."

Continuing, he argues the "record shows that at no time did the Federal agents advise Kasi of his right to consult with a Pakistani diplomat pursuant to Article 36(1) of the Vienna Convention on Consular Relations."  He says "that suppression of

10

all statements obtained by virtue of this illegal arrest and abduction in violation of the extradition treaty . . . and the violations of the Vienna Convention is the appropriate alternative sanction to enforce treaty rights violated."  We reject the arguments based on the treaty and the "Vienna Convention."

During a pretrial hearing, the Commonwealth's Attorney stipulated that defendant was arrested in Pakistan by an FBI agent; that the agent did not "have any jurisdiction in the nation of Pakistan;" that defendant "was not taken before a judicial officer . . . until he returned to the United States and was presented before this Court"; that "in the course of time from his arrest until he was brought to this country there was no compliance with the Vienna Convention until my letter of July 3rd"; and that "the seizure in Pakistan was not made pursuant to any Pakistani paper or document which would allow him to be seized under the laws of Pakistan."  The record shows there "was an unlawful flight warrant issued by a U.S. Magistrate in Alexandria in February of 1993 authorizing Federal agents to arrest Mr. Kansi."  Also, the record shows that the July 3 letter mentioned in the stipulation was a letter from the prosecutor formally notifying the defense of defendant's right to seek consular assistance.

11

The defendant relies upon an Extradition Treaty between the United States and the United Kingdom. 47 Stat. 2122 (1931). Apparently, there is no extradition treaty directly between the United States and Pakistan. But the Attorney General is willing to assume, as represented by the defendant, that the "Islamic Republic of Pakistan has continued in force the treaty promulgated between its former colonial sovereign, the United Kingdom, and the United States," and that it applies to this case.

The defendant focuses on Article 8 of the treaty, which provides:

> "The extradition of fugitive criminals under the provisions of this Treaty shall be carried out in the United States and in the territory of His Britannic Majesty respectively, in conformity with the laws regulating extradition for the time being in force in the territory from which the surrender of the fugitive criminal is claimed."

Contrary to defendant's contention, nothing in this treaty can be construed to affirmatively prohibit the forcible abduction of defendant in this case so as to divest the trial court of jurisdiction or to require that "sanctions" be imposed for an alleged violation of the treaty. The decision on this issue is controlled by United States v. Alvarez-Machain, 504 U.S. 655 (1992).

There, the respondent, a citizen and resident of Mexico, was forcibly kidnapped from his home and flown by private plane to

12

Texas, where he was arrested for his participation in the kidnapping and murder of a federal Drug Enforcement Administration (DEA) agent and his Mexican pilot.  DEA agents were "responsible" for the abduction, although they were not personally involved in it.  Id. at 657.  The United States has an extradition treaty with Mexico.  The issue in the case was "whether a criminal defendant, abducted to the United States from a nation with which it has an extradition treaty, thereby acquires a defense to the jurisdiction of this country's courts." Id.

The Supreme Court, answering that query in the negative, said:  "Extradition treaties exist so as to impose mutual obligations to surrender individuals in certain defined sets of circumstances, following established procedures."  Id. at 664. The Court held that the treaty's language, "in the context of its history," failed to support the proposition that the treaty expressly prohibited abductions outside its terms.  Id. at 666. The Court went on to hold that the treaty should not be interpreted to include an implied term prohibiting prosecution where a defendant's presence is obtained by means other than those established by the treaty.  Id. at 666, 668-69.  See Ker v. Illinois, 119 U.S. 436 (1886) (criminal defendant forcibly abducted from Peru to United States had no right to be returned

13

to this country only in accordance with terms of extradition treaty between United States and Peru).

In the present case, as in Alvarez-Machain and Ker, defendant's seizure in a foreign country and his return to this country were not accomplished pursuant to an extradition treaty. The treaty language here does not expressly or impliedly prohibit prosecution in the United States where the defendant's presence was obtained by forcible abduction.  Like the treaty in Alvarez-Machain, this treaty "does not purport to specify the only way in which one country may gain custody of a national of the other country for the purposes of prosecution."  Id. at 664.  In sum, defendant was not "extradited" under the provisions of this treaty.

As a corollary to the treaty argument, defendant contends his seizure was "illegal and unreasonable" in violation of the Fourth Amendment to the U.S. Constitution and the equivalent Article I, § 10 of the Constitution of Virginia.  We do not agree.

In United States v. Verdugo-Urquidez, 494 U.S. 259, 266 (1990), the Supreme Court held:  "The available historical data show . . . that the purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own Government; it was never suggested that the provision was intended to restrain the actions of the Federal

14

Government against aliens outside of the United States territory."  The Court also said, "There is likewise no indication that the Fourth Amendment was understood . . . to apply to activities of the United States directed against aliens in foreign territory or in international waters."  Id. at 267.

We now turn to defendant's reliance on Article 36(1) of the Vienna Convention on Consular Relations and Optional Protocol on Disputes (Vienna Convention), 21 U.S.T. 77, T.I.A.S. No. 6820 (Apr. 24, 1963), and his claim that its alleged violation requires suppression of his confession.  Defendant conceded in the trial court there is no reported authority for the idea that a violation of the treaty creates any legally enforceable individual rights.  And, the provisions of the document create no such rights.  Indeed, the preamble states that the "purpose . . . is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States."  Article 36 merely deals with notice to be furnished to the consular post of a national's state when the national is arrested or taken into custody in a foreign state.

In the present case, it makes no sense to say that, when the defendant was arrested in Pakistan and turned over to Pakistani authorities, the Vienna Convention required defendant to be notified of his right to contact Pakistani consular officers, even if that country maintained a "consulate" within its own

15

borders.  Indeed, the prosecutor, as soon as defendant returned to this country, notified the defense that defendant had the right to contact the Pakistani consulate here.

Finally on this issue, defendant's suggestion that if he had been advised of his so-called rights under the Vienna Convention, he would not have confessed to agent Garrett is just as speculative as the theory of "prejudice" that the Supreme Court recently rejected in Breard v. Greene, ___ U.S. ___, 118 S.Ct. 1352, 1355 (1998) (repudiating claim that if Vienna Convention had not been violated defendant would have accepted alleged plea agreement).

Next, defendant challenges the admissibility of an arguably inculpatory statement he made to a Fairfax County deputy sheriff and asserts that such a claim is encompassed by assignments of error 4 and 83.  Those assignments, however, challenge defendant's statements to federal authorities following his apprehension in Pakistan.  None of defendant's assignments of error raises the issue argued; thus, it is procedurally defaulted.  Rule 5:17(c).

Next, defendant contends the trial court erred when it refused to suppress the contents of a suitcase found during a search of the apartment where defendant concealed the murder weapon.  We disagree.

The record clearly establishes that Zahed Mir, defendant's roommate and the lessee of the apartment, consented to the search of a suitcase found in a hall closet within the apartment. Two handguns and magazines of AK-47 ammunition were found in the suitcase and eventually were received in evidence. The investigating police officer testified that he had received Mir's "verbal consent several times" to open the suitcase. The trial court correctly concluded, under the evidence, that Mir had the authority to give permission to the officer "to look in" the suitcase, rendering the search valid.

Next, defendant contends the trial court erred in denying his motion for a change of venue. Defendant asserts there were "inflammatory and inaccurate media reports" with "all three local newspapers" reporting that defendant had confessed to the crimes. Arguing that repeated inflammatory pretrial media reports mandate a change of venue, defendant says his constitutional right to a fair trial in this case was violated by refusal of his motion. We do not agree.

There is a presumption that a defendant will receive a fair trial in the jurisdiction where the crimes were committed. To overcome the presumption, a defendant must establish that the citizens of the jurisdiction harbor such prejudice against him "that it is reasonably certain he cannot receive a fair trial." Lilly v. Commonwealth, 255 Va. 558, 570, 499 S.E.2d 522, 531

17

(1998).  The decision whether to grant a motion for a change of venue lies within the sound discretion of the trial court.  Id.

In the present case, even though virtually all the prospective jurors indicated they had heard or read about the case, the court, after careful voir dire, seated a panel of 24 jurors, following detailed questioning of only 58 persons. Defendant did not overcome the presumption that he could receive a fair trial; there was no abuse of discretion by the trial court, especially in light of the relative ease with which the jury was selected.  See Roach, 251 Va. at 342-43, 468 S.E.2d at 109.

Next, the defendant contends that the prosecutor, for discriminatory reasons, used a peremptory strike to remove juror 14, the "only juror of any color on the panel," according to defendant, in violation of Batson v. Kentucky, 476 U.S. 79 (1986), and that the trial court erred in ruling to the contrary. We disagree.

Responding to the claim, the Commonwealth's Attorney represented to the trial court he had struck the juror "because she was the only member of the entire panel who never read anything about the case or heard anything about the case.  My fear is somebody like that is kind of detached from the real world, and that's why I struck her."  The trial court accepted this explanation, and properly denied defendant's claim.

Batson dictates that purposeful discrimination based upon race in selecting jurors violates the Equal Protection Clause. Once an accused makes a prima facie showing of such discrimination, a prosecutor must furnish a reasonable explanation in rebuttal, showing that the reason for the peremptory strike was race neutral. If the explanation is based upon factors other than the juror's race, it is deemed to be race neutral. Id. at 89. Accord Wright v. Commonwealth, 245 Va. 177, 186, 427 S.E.2d 379, 386 (1993), vacated on other grounds, 512 U.S. 1217 (1994).

Assuming, without deciding, that defendant established a prima facie case of purposeful discrimination under Batson, we hold that the record supports the trial court's conclusion that juror 14 was not struck from the panel because of her race. Striking a juror because she had not even read or heard anything about a well-publicized case clearly is a race-neutral reason. See Spencer v. Murray, 5 F.3d 758, 763-64 (4th Cir. 1993) (prosecutor entitled to strike potential juror if he found it "odd" that juror had heard nothing about highly publicized case), cert. denied, 510 U.S. 1171 (1994).

Next, defendant argues that the evidence was insufficient to support his capital murder conviction. Defendant notes that to find him guilty of Darling's capital murder, the Commonwealth had to prove that Bennett's killing was murder in the first degree.

19

Code § 18.2-31(7) ("willful, deliberate, and premeditated killing of more than one person as a part of the same act or transaction" constitutes capital murder). Defendant contends that his murder of Bennett can rise no higher than murder in the second degree because the Commonwealth failed to prove he intended to kill Bennett. We reject this contention.

As the Attorney General points out, the evidence is undisputed that defendant deliberately shot Bennett twice in the chest at extremely close range with a high-powered assault rifle. In his confession, defendant stated not only that he planned and carried out the attack with premeditation and without any provocation, but also that he deliberately aimed his weapon at the victims' chests. This evidence establishes as a matter of law that Bennett's murder was intentional.

Next, defendant contends the trial court erred in denying his motion to "preclude" the testimony of Frank Darling's wife in the penalty phase after she had testified during the guilt phase of the trial. Defendant argues, "In this instance," calling for the second time the murder victim's wife to give victim impact testimony violates "the due process standard of fundamental fairness." We do not agree.

Mrs. Darling was a front-seat passenger in the automobile driven by her husband at the time of his murder. She testified during the guilt phase about the events surrounding the

20

shootings.  During the penalty phase, she testified only about the substantial impact of her husband's murder upon her life. This is the type of victim impact testimony approved in Payne v. Tennessee, 501 U.S. 808, 827 (1991), and in Weeks, 248 Va. at 476, 450 S.E.2d at 389-90, and the trial court correctly refused to exclude it.

Next, defendant contends the trial court erred in failing to sustain his "motion to strike the evidence as to vileness and future dangerousness," both of which issues were submitted to the jury in proper instructions.  The defendant apparently does not argue the evidence was insufficient to establish that Darling's murder was vile, in that it involved "depravity of mind or aggravated battery to the victim," Code § 19.2-264.4(C).  He admitted during oral argument there was "sufficient evidence to reach the jury on the question of vileness."  Instead, he argues: "The trial court's failure to strike the evidence as to future dangerousness was a structural error that unfairly prejudiced Kasi in the sentencing phase" because the prosecutor's argument in support of the future dangerousness predicate (that defendant "would constitute a continuing serious threat to society," id.) "may well have made it easier to show 'depravity of mind.'" There is no merit to this contention.

There was sufficient evidence to submit to the jury the issue of future dangerousness.  Such a finding may be based upon

"the circumstances surrounding the commission of the offense" of which defendant was accused.  Id.  And, a jury may properly conclude, which this jury chose not to do, that the circumstances of this heinous crime satisfy the future dangerousness predicate in that defendant would "constitute a continuing serious threat to society."  Id.  Hence, because the issue of future dangerousness properly was submitted to the jury, it becomes irrelevant whether the prosecutor's argument on that issue "may well have made it easier" to show vileness.

Next, defendant contends the trial court erred in denying his motion for a new trial because the prosecutor allegedly failed to disclose that Mrs. Darling had been diagnosed as having a post-traumatic stress disorder.  The presentence report revealed that, as the result of defendant's murder of her husband in her presence, she suffered from the disorder.  In the motion, defendant asserted the information concerning the disorder, affecting one of the Commonwealth's principal witnesses, was "exculpatory," and that the prosecutor's failure to disclose it at trial violated Brady v. Maryland, 373 U.S. 83 (1963).  The trial court correctly denied the motion during a post-trial hearing.

The Commonwealth's Attorney unequivocally represented to the court that neither he nor any of the investigating police officers had knowledge at the time of trial "of the label that

22

had been placed on this witness by a doctor in Pennsylvania."
The court accepted the representation and found that no one
connected with the prosecution "knew of this event and there's no
evidence that they did." Hence, there is no merit in defendant's
Brady claim. The prosecution's duty to disclose is limited to
information then known to it. See Robinson v. Commonwealth, 231
Va. 142, 155, 341 S.E.2d 159, 167 (1986).

Next, defendant contends the trial court erred in certain
rulings on jury matters made during and after the trial. We
already have ruled that several jury related issues defendant
raises are meritless, that is, the court's refusal to inquire of
the jurors whether they engaged in premature deliberations
(assignment of error 31) and refusal to declare a mistrial when
the jury expressed concern about their personal security
(assignment of error 34).

During the morning of the second day of trial in the penalty
phase, and after the verdict in the guilt phase had been
announced, defendant advised the court there had been press
reports that morning of the killing of four Americans in Karachi,
Pakistan the preceding evening. Defendant then asked the court
to question the jurors individually to determine whether any had
heard or read the reports. The court declined the motion, but
continued its practice of asking the jurors at the beginning of
each day of trial whether they had followed the court's

23

admonition not to read, look at, or listen to any reports about the case. Juror 31 accidentally had heard a portion of a radio report about the Karachi killings, but the court, upon questioning her, determined she remained impartial and that none of the other jurors were aware of the report.

The case proceeded for the remainder of the morning with testimony of defendant's mitigation witnesses. After lunch, however, the trial court decided to sequester the jury for the rest of the case. The court said the press reports of the trial had degenerated into "opinion and speculation," noting that "the reporting has gotten crazy."

The court's refusal to grant defendant's repeated motions for a mistrial during this series of trial events was an exercise of the court's sound discretion, and we find no abuse of that discretion.

Next, defendant contends the trial court erroneously denied permission for defendant to contact a juror for questioning and to conduct an inquiry about the jury's deliberations. The issue arose against the following background.

Prior to trial, the court denied permission for defendant to contact potential jurors. The names of the jurors were not made public by agreement of counsel. At the beginning of the penalty stage on November 11, the court entered an order prohibiting the disclosure of "the name, address, identity or image" of any juror

24

after considering "the need to protect jurors, the absolute right of jurors not to discuss the case, and protection of the confidentiality of juror deliberations."

On November 20, six days after the jury's sentencing verdict was rendered, a newspaper published an article reporting information gleaned from an interview with one juror about the penalty stage deliberations. The article quoted the juror as stating, for example, that some jurors "thought the crime was vile because Kasi, an immigrant, 'had attacked the American way of life.'" Also, the juror reportedly labeled defendant a "terrorist," a term the court had prohibited the participants from attaching to defendant during the trial proceedings.

On January 6, 1998, defendant moved to set aside the sentencing verdict, alleging juror misconduct on the basis of the article. He also asked for permission to subpoena the juror for interrogation. After a hearing, the trial court, assuming the news article accurately reported the juror's statements, denied both motions. The court ruled that the reported information "relates to the mental impressions of the jury and the way that they deliberated and considered the evidence." Hence, according to the court, inquiry of the jury was not allowed. The trial court was correct.

Virginia has been more careful than most states to protect the inviolability and secrecy of jury deliberations, adhering to

25

the general rule that the testimony of jurors should not be received to impeach their verdict, especially on the ground of their own misconduct.  <u>Jenkins</u>, 244 Va. at 460, 423 S.E.2d at 370.  Generally, we have limited findings of prejudicial juror misconduct to activities of jurors that occur outside the jury room.  <u>Id.</u>  Here, the alleged misconduct clearly occurred within the confines of the jury room, and a post-trial investigation into the allegations was unwarranted.

Finally, defendant contends the sentence of death was imposed under the influence of passion, prejudice, or other arbitrary factor, and that the death sentence was excessive or disproportionate to the penalty imposed in similar cases.  While not directly addressing those issues, defendant asks the Court to "commute this death sentence to life in prison without parole."

The defendant bases his plea for commutation on an argument laced with hyperbole, and threats inappropriate in an appellate brief.  He reaches conclusions having absolutely no foundation in this record.  For example, he says the death sentence resulted from the "open hostility" of the trial judge and because the prosecutors "were diligent in maligning the defense team repeatedly in the media."  The record shows otherwise.  The trial court in all the proceedings was thorough, even-handed, and considerate of all counsel, and presided in a manner that was fair both to the Commonwealth and the defendant.  The

26

Commonwealth's Attorney was diligent, well-prepared, and did not exceed the bounds of conduct expected of an aggressive prosecutor.

The defendant says that because his crimes were "political," he somehow is entitled to First Amendment protection, and that his death sentence should be commuted to avoid possible violent acts of reprisal. As the Attorney General observes, defendant received the death sentence, not because he had a political motive, but because he murdered two innocent men, and maimed three others, in an extremely brutal and premeditated manner. As the defendant moved among the stopped automobiles, he shot through the rear window of the Darling vehicle, severely wounding Darling in the torso. In a few seconds, defendant appeared at the front of the Darling vehicle and fired at him again, destroying a part of his head. Darling also suffered at least one gunshot wound to his lower leg, resulting in a compound fracture. There is nothing "arbitrary" about a death sentence imposed under the circumstances of this case and, thus, there is no basis for commutation.

In conducting our proportionality review, we must determine "whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." Jenkins, 244 Va. at 461, 423 S.E.2d at 371. See former Code § 17-110.1(C)(2) (now

27

§ 17.1-313(C)(2)).  We have examined our records of all capital murder cases, see former Code § 17-110.1(E) (now § 17.1-313(E)), including those cases where a life sentence was imposed.  We have particularly studied those cases in which the death penalty was based on the vileness factor.  See Cardwell v. Commonwealth, 248 Va. 501, 517, 450 S.E.2d 146, 156 (1994), cert. denied, 514 U.S. 1097 (1995).

Based upon this review, we conclude that defendant's death sentence is not excessive or disproportionate to penalties generally imposed by sentencing bodies in the Commonwealth for similar conduct.  The death sentence generally is imposed for a capital murder when, as here, the defendant is also convicted of killing another person.  Goins v. Commonwealth, 251 Va. 442, 469, 470 S.E.2d 114, 132, cert. denied, 519 U.S. 887 (1996).

Consequently, we hold the trial court committed no reversible error, and we have independently determined from a review of the entire record that the sentence of death was properly assessed.  Thus, we will affirm the trial court's judgment.

Record No. 980797 — Affirmed.
Record No. 980798 — Affirmed.

28