COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Elder and Haley
Argued at Salem, Virginia


TIMOTHY GLEN WORKMAN

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 2217-03-3                      JUDGE JAMES W. BENTON, JR.
                                                           AUGUST 2, 2005
COMMONWEALTH OF VIRGINIA


                    FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
                                  Jonathan M. Apgar, Judge

             Anthony F. Anderson (Melissa W. Freidman, on briefs), for
             appellant.

             Donald E. Jeffrey, III, Assistant Attorney General (Jerry W. Kilgore,
             Attorney General, on brief), for appellee.


        A jury convicted Timothy Glen Workman of voluntary manslaughter.  Workman contends

the trial judge erred (i) in denying his instruction on self-defense "without fault" and giving a "with

fault" self-defense instruction, (ii) in giving an instruction that incorrectly stated the principles of

Allen v. United States, 184 U.S. 492 (1896), and (iii) in ruling the Commonwealth did not violate

the principles of Brady v. Maryland, 373 U.S. 83 (1963).  For the reasons that follow, we affirm the

trial judge's rulings.

                                            I.

        Timothy Workman, a Drug Enforcement Administration agent, shot and killed a man

outside a restaurant in Roanoke.  Workman was on a temporary assignment in Virginia and was

at the restaurant during his off-duty time.  At trial, Workman testified that he acted in

self-defense.  The jury acquitted him of murder and convicted him of manslaughter.

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Workman contends that the trial judge "erred in denying the defendant's theory of defense instruction encompassing self defense without fault and in giving the court's self defense instruction which contained a fault component and a misleading statement of law." In accordance with well established practice, when we consider a trial judge's "refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." Commonwealth v. Vaughn, 263 Va. 31, 33, 557 S.E. 220, 221 (2002). So viewed, Workman testified that he and his work partner, another D.E.A. agent, left their hotel rooms shortly after arriving in Roanoke and went to the hotel's bar. Workman drank three beers, and, later at dinner, Workman drank a glass of wine. After dinner, the men went to O'Charley's restaurant, where Workman drank another glass of wine and had other drinks. At 11:00 p.m. Workman drove his partner back to the hotel, and Workman returned to the restaurant.

At the restaurant, Workman had drinks in the restaurant's bar area where he met Melissa Booth and her friends. When the restaurant closed, Workman went to the parking lot with Booth, talked with her outside her car, and then sat in her car with her. As they continued their conversation in Booth's car, another car arrived and stopped beside Booth's car. Keith Bailey and James Bumbry were in that car and motioned for Booth to open her window. Workman testified that Booth "seemed kind of alarmed or confused, who are these guys, why are they pulling up beside me." When Booth rolled down her window, the men were screaming "that [Workman] didn't need to be with this woman, to get out of the car." Workman said the men told Booth, "Why you want to be with this guy, come with us you'll have more fun." Workman testified that he "flipped the finger" to the men in response to their comments and both men got out of the car. When he heard Bailey say "I'll fucking kill you, you bitch," Workman retrieved his gun from a ankle holster and put it in his right rear pocket.

- 2 -

Workman testified Booth saw the gun and became frightened of it and the events. He told Booth not to worry, he was "a cop," and "he would take care of [her] or something." Recognizing he was in a "confined space," Workman opened the car door and exited the car. Bailey was "at the end of the trunk coming straight at [Workman] yelling" that he knew Booth and that Workman did not have "any business in [Booth's] vehicle." Workman put his hand near his gun and yelled for Bailey to "get [his] ass back in the car." He testified Bailey "didn't break stride[,] came straight at" him, grabbed him by the throat, and pinned him against the door. Workman testified that as Bailey was choking him, he saw Bumbry coming from his vehicle to the front of Booth's vehicle. He testified that Bumbry was "draw[ing] a small frame automatic [weapon] from his pocket" and that the weapon was "coming towards the back of [his] head."

Workman testified he then "drew his firearm" and "began to raise it," hoping that Bailey would "step back and Workman could engage Bumbry." Instead, Bailey grabbed Workman's gun and "began to twist." Workman testified that he told Bailey that he was "a cop" but that Bailey continued to struggle for the weapon and was "pulling [Workman] down" toward the car seat. He testified that "with one man coming behind [him] with the gun, at that time [he] figured [he] had nothing else to do. So [he] tried pulling the trigger." After the first shot missed Bailey, Workman and Bailey fell into Booth's car. Workman testified he shot two more times because Bailey was "kind of on top of [him]" and "pull[ed] the trigger one more time" as they continued to fight. When Bailey fell, Workman saw Bumbry and Booth driving their cars from the parking lot.

Booth testified she was not acquainted with Bailey and Bumbry. She had seen them earlier in the bar area but had no conversation with them other than a possible greeting in passing. Booth testified she told Workman she did not know the men and wondered why they were asking her to open her window. She testified that when she opened her window, the men screamed that they knew Workman, that they knew her, and that Workman "better leave her

alone." She testified Workman made a gesture with his hand ("flipped them off"), and she admonished him, "Don't do that around here. People are crazy. They're all crazy."

Booth testified Bailey jumped out of his car and moved around the back of her car. As Bailey advanced towards the passenger side, Booth saw that Workman had a gun in his waistband. Workman patted it and told her not to worry, because he was a police officer. Booth screamed at Workman to get out of her car. She did not see Bailey with a weapon, but saw a shiny object at his waist.

Booth testified that the door of her car was opened somehow and that Workman and Bailey began wrestling in her passenger seat. She then heard a gunshot and saw the two men roll out of her car. Booth pulled the door shut and drove off. She then heard another shot. As she was driving from the parking lot, Bumbry, who was then driving the other car, "cut [her] off to get out [of the lot] in front of [her]." At a stoplight, Bumbry yelled to her "[w]here is my friend?" Booth told him she did not know and said "Just go. Just Drive." She testified she did not know whether Bumbry had a gun.

Sylvia Harman testified she heard an argument between two men, saw Bailey walk around Booth's car, and heard Workman say that Booth was "my girl." She saw Bailey choke Workman and saw Workman reach for his pocket. When her sister pushed her down, she heard a shot and then saw Bumbry drive away. Booth then drove away.

Her sister, Theresa Harman, said she heard Workman and Bailey arguing about Booth. She also saw the men fighting but did not know how it began. During the fight, Bailey grabbed Workman by his throat. When she saw a gun she pushed her sister on the ground and heard shots.

Clippings of Bailey's fingernails were positive for Workman's DNA. Forensic evidence supports Workman's testimony that he fired four shots, and it suggests that one of the shots may have lodged in the seat of Booth's vehicle. Expert witnesses described three close-range "contact"

gunshot wounds to Bailey's body. Forensic analyses also indicated that Bailey's hands were positive for the presence of gunpowder residue. In addition, analyses of the alcohol content of Workman's and Bailey's blood indicated that both men were intoxicated at the time of the incident.

Booth, Bumbry, and other Commonwealth witnesses gave testimony that contradicted, in part, Workman's testimony. At the close of the evidence, Workman submitted instructions on his theory of self-defense. The trial judge rejected Instruction A and Instruction B, which read as follows:

### Instruction No. A

If you believe from the evidence that Timothy Workman at the time of the shooting was without fault on his part and was being attacked by the deceased, and further that he reasonably feared death or serious bodily harm to himself at the hands of the deceased, then he had the right to stand his ground and, if necessary, kill his assailant. If you further believe this to be the situation in the instant case, you shall find Timothy Workman not guilty.

### Instruction No. B

In passing upon the danger, if any, to which Timothy Workman was exposed, you will consider the circumstances as they reasonably appeared to Timothy Workman, and draw such conclusions from these circumstances as he, Timothy Workman, could reasonably have drawn, situated as he was at the time. The Court instructs you that Timothy Workman is entitled to be tried and judged by facts and circumstances as they reasonably appeared to him and not by any intent that may or may not have existed in the mind of the deceased.

The trial judge granted, instead, a "waterfall" instruction which included both "at fault" and "without fault" components. This instruction, number 16, reads as follows:

The defendant, Timothy Workman, relies upon the law of self-defense. The law of self-defense is the law of necessity, and the necessity the defendant relies upon to justify his actions cannot arise from his own misconduct.

In determining whether it was necessary for the defendant to use deadly force, you must consider the circumstances as they

would reasonably have appeared to him, situated as he was at the time. There must have been some observable act from which the defendant reasonably could have concluded that he was in imminent danger of death or serious physical injury. Whether the danger is reasonably apparent is always to be determined from the viewpoint of the defendant at the time he acted.

If the defendant, Timothy Workman, was without fault in provoking or bringing on the controversy, and if he reasonably feared, under the circumstances as they appeared to him, that he was in danger of being killed, or that he was in danger of great bodily harm, then he was entitled to stand his ground without retreating and, if necessary, to use deadly force to defend himself. A killing under such circumstances is in self-defense, even if it turns out afterwards that there was, in fact, neither design to do him serious bodily injury or danger that it would be done.

If the defendant, Timothy Workman, was to some degree at fault in provoking or bringing on the difficulty, he may still be entitled to have you conclude that the killing was in self-defense if, when attacked, he retreated as far as he safely could under the circumstances, in a good faith attempt to abandon the fight; and he made his desire for peace known, by word or act; and if he reasonably feared, under the circumstances as they appeared to him, that he was in danger of being killed or that he was in danger of great bodily harm.

If, upon a consideration of all the evidence of the case, you believe that the killing was in self-defense, or you have reasonable doubt that the killing was a criminal act, then you must find the defendant not guilty.

The trial judge also instructed the jury that

[w]hen a person reasonably apprehends that another intends to attack him for the purpose of killing him or doing him serious bodily harm, then such person has a right to arm himself for his own necessary self-protection, and in such case, no inference of malice can be drawn from the fact that he prepared for it.

Another instruction told the jury that "[w]hen one is assaulted he may use in self-defense only such force as appears to him reasonably necessary to repel the attack." At the conclusion of all the evidence, the jury convicted Workman of voluntary manslaughter.

Workman's argument concerning the instructions consists of two parts, which we address in turn. He first contends that the trial judge erred in instructing the jury that it could find he was "at fault." Workman argues that, as a matter of law, he "was without fault in bringing about the altercation that led to Bailey's death" and that his self-defense instruction properly was limited to his conduct being "without fault." We disagree because the issue whether Workman was "at fault" or "without fault" was properly an issue for the jury to decide.

The evidence before the jury was sufficient to support an "at fault" instruction." In the Commonwealth's case, Bumbry testified that earlier in the evening Booth and her friends engaged in conversation with him and Bailey inside the restaurant's bar. When Bumbry and Bailey were about to drive away from the parking lot, they saw Booth in her car and stopped to say to her "have a safe trip home." Bumbry testified Workman responded by "giving [the two men] the middle finger." Bailey then exited from the driver's seat and walked around Booth's car. Bumbry testified that Workman then exited Booth's car with "a gun on his hip." He described then the events that followed:

> I said, [Bailey], . . . he got a gun on him. Leave it alone, man.
> He's like I ain't --- he was like I just want to ask him why he stuck
> his middle finger up at us. So when he got out --- Mr. Workman
> got out. [Bailey] looked at him. He looked at [Bailey]. And
> [Bailey] said is this your car? He said no. He said, is your
> woman? He said no. He said so why are you sticking the middle
> finger up at us. We wasn't talking to you. We was just trying to
> tell her to have a safe trip home. And Mr. Workman said, you just
> need to get out of here. And then [Bailey] was like I just want to
> know why you stuck your middle finger up. He said, you just need
> to get out of here. And [Bailey] was like I'm a grown man. I ain't
> got to go nowhere. Then Mr. Workman went for his gun and
> grabbed his gun and pulled it out. As he did that, [Bailey] grabbed
> his hand to keep him from raising the gun at him. Then they were
> struggling for the gun. When they were struggling for the gun, I
> yelled that you better not shoot him to Mr. Workman. And the gun
> went off one (1) time down. . . .

Theresa Harman, who was a witness called by Workman, also testified that when she first saw the events in the parking lot, Bailey "was standing on the driver's side just talking to [Booth]." She then "noticed . . . someone from the passenger side yelling to . . . Bailey. And he said, we're just talking. We're just friends. And that's when Workman said you don't need to be talking to my girl." She then heard Booth say "we're just talking. We're just friends." Then a fight broke out.

The conflict in the testimony about the onset of the fight was a question of fact for the jury. "A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" Darnell v. Commonwealth, 6 Va. App. 485, 488, 370 S.E.2d 717, 719 (1988) (citation omitted). "[A] jury must be informed as to the essential elements of the offense; a correct statement of the law is one of the 'essentials of a fair trial.'" Id. (quoting Dowdy v. Commonwealth, 220 Va. 114, 116, 255 S.E.2d 506, 508 (1979)). Thus, when the judge instructs the jury, "[b]oth the Commonwealth and the defendant are entitled to appropriate instructions to the jury of the law applicable to each version of the case, provided such instructions are based upon the evidence adduced." Stewart v. Commonwealth, 10 Va. App. 563, 570, 394 S.E.2d 509, 514 (1990) (citation omitted).

In this case, the trial judge's instruction fairly informed the jury of Workman's theory of his defense because it informed the jury of principles of self-defense when an accused is "without fault." In addition, however, the evidence supported the instruction regarding self-defense when an accused is "at fault." Thus, the trial judge did not err in refusing the instructions tendered by Workman and in giving an instruction with both an "at" fault and a "without fault" component.

Workman contends that, in any event, jury instruction 16 contained a misleading statement of the law, specifically the phrase, "the necessity the defendant relies upon to justify his actions cannot arise from his own misconduct." He argues the phrase was confusing because the jury could have misconstrued "misconduct" to include events such as being in a car at 2:00 a.m. with a woman not his wife, being at a bar with a loaded weapon, touching a woman's breast and inviting her to his room, and having a firearm unapproved by the D.E.A.

Workman made this argument for the first time post-verdict. Thus, the issue is procedurally defaulted under Rule 5A:18:

> No ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice.

Furthermore, no ends of justice issue has been raised. In any case, the instruction the judge gave the jury encompassed the issues covered in the instruction Workman's attorney offered. The instructions explain that in determining whether Workman's actions were "necessary . . . there must have been some observable act from which the defendant could have reasonably concluded that he was in imminent danger of death or serious injury. Whether the danger is reasonably apparent is always to be determined from the viewpoint of the defendant *at the time he acted*." In short, the instructions clearly informed the jury that the "misconduct" concerned Workman's actions during the altercation. For these reasons, the trial judge did not err in granting the instructions.

## II.

Workman contends that the trial judge erred in giving an instruction that was "an incorrect statement of the law and was not a fair reading of the <u>Allen</u> charge."

The Supreme Court has approved use of the "<u>Allen</u>" instruction and has held that the standard of review of the trial judge's decision to read the <u>Allen</u> instruction is abuse of

discretion.  Poindexter v. Commonwealth, 213 Va. 212, 215, 191 S.E.2d 200, 203 (1972).  In

making this determination, we are guided by the following well-settled principles:

> [W]hen jurors have announced their inability to agree it is within
> the discretion of the trial court to urge on them an earnest effort to
> reach an agreement.  In doing so, the court may point out the
> importance of their reaching an agreement and their duty to do so
> if they can without surrendering their individual consciences.
> While there is some conflict on the subject, the great weight of
> authority is that in urging the jury to agree the court may detail to
> them such matters as the expense of the trial, the time it has taken
> to try the case, the trouble and inconvenience involved, and the
> fact that in the event of a disagreement the case will have to be
> decided by some jury on the same pleadings and in all probability
> on the same evidence.

Petcosky v. Bowman, 197 Va. 240, 252, 89 S.E.2d 4, 13 (1955) (citations omitted).

During its deliberations at the punishment phase of the trial, the jury sent a written

question to the judge:  "If we can't come to an unanimous decision on the sentencing, does the

sentencing revert to the judge?"  In view of this inquiry, the trial judge reasonably concluded the

jury needed a response.  Therefore, the judge did not abuse his discretion in concluding further

instruction was appropriate.

Workman next contends that the specific instruction the judge used was not an

appropriate response to the jury's question and was an incorrect statement of the law in view of

our bifurcated sentencing procedures.  In particular, Workman objects to the following

instruction, which the trial judge gleaned from the appendix to Titcomb v. Wyatt, 1 Va. App. 31,

333 S.E.2d 82 (1985):

> Trials are expensive and the jury must decide the issues in the
> case.  If you cannot decide, then we will have to get another jury to
> decide the issues.  I see no reason why you as jurors are not as
> competent and able to decide the issues as any other jury.

Id. at 41, 333 S.E.2d at 87.  He argues, the trial judge should have instructed the jury instead on

the procedural requirements of Code § 19.2-295.1, which provides that when "the jury cannot

agree on a punishment and if the defendant, the attorney for the Commonwealth, and the court agree, in the manner provided in [Code] § 19.2-257, then the court shall fix punishment."

When this issue was raised at trial, the judge responded as follows:

> And just me just state for the record, before we all came out here we all took a look at [Code §] 19.2-295.1, and everyone was satisfied that the state of the law is that if the jury can't reach an unanimous verdict, that absent an agreement, another jury would be called and ascertain punishment. . . . So I think it's --- I've told them a correct statement, but in addition, if I told them upon agreement from the Commonwealth and the defendant as the statute authorizes, that it could possibly been done by the Court, only invites them not to deliberate any further. . . . If they come back and say no, they are irrevocability hung, then I will discharge them as to punishment. And you and [the prosecutor] will have the opportunity to see if you want to, under the code section, have the Court set punishment in the case or if you want another jury impaneled as to punishment. So, I agree with you. Yes, to the extent that we did not fully discuss with them [Code §] 19.2-295.1, you are correct. But I think it would only invite them to stop deliberations immediately.

We believe the trial judge's reasoning for not delving into the statutory procedures comports with the Supreme Court's ruling that "procedural matter[s] [are] not an appropriate subject for a jury instruction." Schmitt v. Commonwealth, 262 Va. 127, 147, 547 S.E.2d 186, 200 (2001). The trial judge's explanation is consistent with the Supreme Court's observation that "[i]nstructions of this nature also constitute an open invitation for the jury to avoid its responsibility and to disagree on the sentence that a . . . defendant should receive." Id.

Workman also contends the instruction was premature because "the jury had not 'announced their inability to agree.'" He further contends that the instruction was not fair, neutral, and balanced because it was not the instruction the Supreme Court approved in Poindexter or the instruction suggested in the American Bar Association's Proposed Standards For Trial By Jury (cited in Poindexter, 213 Va. at 215 n.1, 191 S.E.2d at 203 n.1). These issues were not the basis for the objection at trial. We, therefore, decline to consider them on appeal.

- 11 -

Rule 5A:18. Accordingly, we hold that the record does not demonstrate that the trial judge abused his discretion.

III.

After the jury rendered its verdict and prior to entry of the final conviction order, Workman filed a motion for a new trial, contending that the Commonwealth failed to provide him with exculpatory evidence. The Commonwealth responded, in part, that the information was neither evidence under <u>Brady</u> nor favorable to Workman and that the information was not material. Workman contends the trial judge erred in ruling that the evidence presented at the evidentiary hearing failed to prove a <u>Brady</u> violation.

The evidence at the hearing proved that Detective Meador and Officer Garrett, an investigator assigned to the D.E.A. task force, interviewed Jerry Mackey in the jail three days after Workman killed Bailey. In the interview, which concerned a homicide unrelated to the Workman case, Mackey said:

> So uh also on a D.E.A. matter, at the Ole Charley's Restaurant, uh, James, James II Bumbry, James Bumbry, II, uh, was with Keith, what's his last name. He's the one . . . tried to pass Keith a gun and the officer, D.E.A. had to respond, . . . whatever happened and Jay II, . . . at that Jay II fled the scene with the weapon. Mackey also said he "got that information over the phone from several uh people that's been out there in the streets, just calling friends, reliable friends."

Detective Meador testified that the interview was instigated by the D.E.A. investigator. Detective Meador testified that he informed the lead detective assigned to Workman's case about the interview and then filed the interview report in his file on the unrelated homicide.

Peter Sullivan, Workman's independent investigator, testified that he was speaking with Officer Garrett after Workman's trial when Officer Garrett remarked about Mackey's statement. Sullivan interviewed Mackey at a federal prison and recorded an interview in which Mackey said he knew Bumbry by the "nicknames" of "J-2" but did not know Keith Bailey. Mackey said the

information he had previously given to Detective Meador about the Workman incident came from George Fitzgerald. Mackey also told Sullivan about an incident in which Fitzgerald shot at Bumbry, after Bumbry had fired a weapon at him. Mackey said he knew Bumbry carried guns "very often, all the time, in clubs and just on the block hanging," and he also told Sullivan of three altercations during which Bumbry had fired a gun at other people.

Sullivan interviewed Fitzgerald in jail following the interview with Mackey. Fitzgerald, who had been convicted for malicious wounding of Bumbry, said he did not want to give Sullivan the name of a person who could testify that Bumbry had a gun the evening Workman shot Bailey. During a second interview, Fitzgerald told Sullivan that Bumbry had once threatened and shot at Fitzgerald and that Fitzgerald had given this information to the police shortly before he spoke to Sullivan.

Officer Garrett testified he was assigned to a D.E.A. task force and had arrested Mackey shortly before Mackey made those statements. Three days after the Workman shooting, he was contacted by a person on behalf of Mackey and arranged for Detective Meador to interview Mackey. Officer Garrett testified Mackey was one of his "snitches" and acknowledged that Mackey was in a position "to try to obtain substantial assistance to lower his sentence." Indeed, Officer Garrett had assisted Mackey in having four federal charges reduced to two charges because of Mackey's cooperation. Later, Mackey's sentence was further reduced.

Officer Garrett further testified that he was one of the officers who responded to the restaurant the night Workman shot Bailey and that he spoke with Workman this same night. He testified Workman said one of the two men had a gun the night Workman shot Bailey. He also acknowledged, however, that he did not make a record of Workman's statement.

Officer Garrett also testified he was interviewed by Workman's attorney prior to Workman's trial and did not disclose the information he learned from Mackey. He also

acknowledged that when the D.E.A. gave permission for him to speak to the prosecutors prior to trial he did not disclose the statements to the prosecutors.

Detective Lee testified that the night of the shooting Officer Garrett said "it wouldn't surprise him if J-2 had a gun also . . . making reference to Mr. Bumbry." He said Officer Garrett never gave him an incident report "document[ing] a statement of that nature by Workman."

Detective Lukacs testified that prior to Workman's trial, Detective Meador told him "Mackey had mentioned something about Mr. Bumbry attempting to give Mr. Bailey a gun regarding the homicide at O'Charlie's restaurant." He said Detective Meador indicated Mackey was not specific and "just indicated he had heard this from individuals, which [Mackey] refused to name at that time." Detective Lukacs said that he later talked to Mackey and that Mackey did not give him any more information.

In an opinion letter, the trial judge found that the first Mackey statement "is mired in hearsay, opinion, and conjecture," and he ruled that the statement "never would have come before a fact finder." Therefore, he held, that statement was not material. The trial judge also ruled, however, that the prosecution should have disclosed Mackey's statement and that its disclosure would have led to Mackey's statement about Fitzgerald. The trial judge found that this statement must be looked at in light of its effect on Bumbry's credibility, but he ruled that it does not "put the whole case in such a different light as to undermine confidence in the verdict." He found that the claim that Bumbry shot at Fitzgerald would have required "a separate trial within a trial" likely showing, as in Fitzgerald's prosecution, that Bumbry was "an innocent victim and not a shooter." He ruled that the Fitzgerald statement does not "rise to a reasonable probability that the result of the proceeding would have been different" if it had been disclosed to the defense. The trial judge concluded that Workman's claims "just do not rise to a reasonable

- 14 -

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Thus, he denied Workman's motion for a new trial.

In our review of the trial judge's finding that the evidence was not material, we are guided by the following principles:

> "[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). Favorable evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985). Accord Kyles v. Whitley, 514 U.S. 419, 433, 434 (1995). In other words, a petitioner must show that when the case is evaluated in the context of the entire record, including the omitted evidence, a jury would have entertained a reasonable doubt regarding petitioner's guilt. See Bagley, 473 U.S. at 682; United States v. Agurs, 427 U.S. 97, 112-13 (1976). Accord Kyles, 514 U.S. at 460 (Scalia, J., dissenting).

Soering v. Deeds, 255 Va. 457, 464, 499 S.E.2d 514, 517 (1998).

Both parties agree that Mackey's first statement was in the possession of the police, that the prosecution inadvertently failed to disclose Mackey's statement, and that the statement is favorable to Workman. The sole issue presented is whether the evidence meets the Brady test for materiality. In making his determination, the evidence the trial judge considered included (1) Mackey's first statement to police, in which he disclosed that someone said Bumbry attempted to pass Bailey a gun just prior to the altercation with Workman, (2) Mackey's statements describing Bumbry's general propensity to carry weapons and his participation in three shootings, and (3) Fitzgerald's statements to Sullivan that Bumbry fired at him first during the incident for which Fitzgerald had been convicted of maliciously wounding Bumbry.

The trial judge properly considered the evidence collectively, and not just the original Mackey statement. The record supports the trial judge's finding that the first Mackey statement

- 15 -

was "mired in hearsay, opinion, and conjecture." Indeed, Mackey's statement that Bumbry had tried to pass a gun to Bailey before the altercation with Workman was not based on Mackey's personal knowledge and, thus, was not admissible to impeach Bumbry's trial testimony that he did not carry a weapon that night. The trial judge recognized that "admissibility at trial may not be the final arbiter of any <u>Brady</u> violation." <u>See</u> <u>Coleman v. Calderon</u>, 150 F.3d 1105, 1116-17 (9th Cir. 1998) ("To be material [under <u>Brady</u>], evidence must be admissible or lead to admissible evidence."); <u>Wright v. Hopper</u>, 169 F.3d 695, 704 (11th Cir. 1999) ("Inadmissible evidence may be material if the evidence would have led to admissible evidence."); <u>but see</u> <u>Wood v. Bartholomew</u>, 516 U.S. 1, 5-6 (1995) (per curiam) (holding that polygraph results inadmissible under state law was "not 'evidence' at all" for purposes of the <u>Brady</u> materiality test); <u>United States v. Ranney</u>, 719 F.2d 1183, 1190 (1st Cir. 1983) ("inadmissible evidence is by definition not material, because it never would have reached the jury and therefore could not have affected the trial outcome"). The judge ruled, however, that "the first Mackey statement, on its own, does not meet the materiality test."

Workman's evidence established that the source of Mackey's information was Fitzgerald. The evidence did not establish, however, that Fitzgerald had any personal knowledge about the events. Indeed, the record essentially established that he lacked personal knowledge because one of the detectives testified that Fitzgerald refused to disclose the identity of the person whom Fitzgerald claimed provided the information to him. Thus, Mackey's inadmissible statement led to Fitzgerald's inadmissible statement. No evidence tended to establish Fitzgerald would have led to any admissible evidence. Thus, the trial judge would have to speculate about Fitzgerald's source of information. The record renders it just as likely, as not, that Fitzgerald's source of information was rumor. As the Supreme Court has held "evidence that is inadmissible at trial is not 'evidence' at all, for <u>Brady</u> purposes." <u>Soering</u>, 255 Va. at 464, 499 S.E.2d at 517-18.

- 16 -

Workman also contends that Mackey's statement would have led to the discovery of Fitzgerald who had other evidence about "Bumbry's past specific acts of violence and his propensity toward violence and aggressiveness." No evidence tended to show that the prosecutor or the police had undisclosed information about Bumbry's specific acts of violence and propensity toward violence. "The prosecution's duty to disclose is limited to information then known to it." Kasi v. Commonwealth, 256 Va. 407, 423, 508 S.E.2d 57, 67 (1998).

The record also establishes that Workman presented evidence at trial concerning an incident in which Bumbry aimed a gun at a police officer. In addition, Bumbry testified before the jury about his criminal record including firearm offenses. Furthermore, the evidence at the post-trial hearing disclosed that Fitzgerald had been convicted of maliciously wounding Bumbry after a trier of fact rejected his claim that Bumbry shot at him. The trial judge found that this information was known to Workman before trial.

In short, the jury heard evidence at trial about Bumbry's criminal history, including firearm offenses, and the jury knew that Bumbry was serving a felony sentence in a federal prison at the time he was testifying as a witness in this prosecution. Thus, the trial judge found that Fitzgerald's testimony about other firearm events would "not put the whole case in such a different light as to undermine confidence in the verdict."

We hold that the record supports the trial judge's finding that the evidence failed to establish materiality in the constitutional sense. For these reasons, we affirm the conviction.

Affirmed.