**Mir Aimal KASI, Petitioner,**

v.

**Ronald J. ANGELONE, Director of the Virginia Department of Corrections, Respondent.**

**No. CIV.A. 200CV470.**

United States District Court, E.D. Virginia, Norfolk Division.

Jan. 10, 2002.

588

Richard J. Cromwell, McGuire Woods LLP, Norfolk, Charles R. Burke, Virginia Beach, for Petitioner.

Katherine P. Baldwin, Robert Q. Harris, Office of the Attorney General, Richmond, for Respondent.

## ORDER AND OPINION

FRIEDMAN, District Judge.

This matter was initiated on December 11, 2000, by a petition for a writ of habeas corpus under Title 28, United States Code, Section 2254 filed by Mir Aimal Kasi ("petitioner"). On November 10, 1997, the petitioner was convicted of capital murder, first degree murder, three counts of malicious wounding, and five counts of use of a firearm in the commission of a felony. On February 4, 1998, the petitioner was sentenced to death for capital murder, life imprisonment for first degree murder, twenty years of imprisonment per act for the malicious wounding counts, and a total of eighteen years for the five firearm charges. The petitioner's section 2254 petition alleges violations of the federal rights pertaining to the petitioner's apprehension in Pakistan and a number of constitutional violations at trial and sentencing.

## FACTUAL BACKGROUND

The facts relating to Kasi's actions have been fully set forth by the Supreme Court of Virginia in *Kasi v. Commonwealth*, 256 Va. 407, 508 S.E.2d 57 (1998), *cert. denied*, 527 U.S. 1038, 119 S.Ct. 2399, 144 L.Ed.2d 798 (1999), and by Magistrate Judge Bradberry in his September 12, 2001 Report and Recommendation ("R & R") currently before this court. Because the following review of petitioner's claims are so intertwined with the facts of the case, the court will briefly provide a summary here.

On Monday, January 25, 1993, near 8:00 a.m., a number of automobiles were stopped in two north-bound, left-turn lanes on Route 123 in Fairfax County at the main entrance to the headquarters of the Central Intelligence Agency (CIA). The vehicle operators had stopped for a red traffic light and were waiting to turn into the entrance.

At the same time, a lone gunman emerged from another vehicle, which he had stopped behind the automobiles. The gunman, armed with an AK–47 assault rifle, proceeded to move among the automobiles firing the weapon into them. Within a few seconds, Frank Darling and Lansing Bennett were killed and Nicholas Starr, Calvin Morgan, and Stephen Williams were wounded by the gunshots. All the victims were CIA employees and were operators of separate automobiles. The gunman, later identified as defendant Mir Aimal Kasi, also known as Mir Aimal Kansi, fled the scene.

At this time, defendant, a native of Pakistan, was residing in an apartment in Reston with a friend, Zahed Mir. Defendant was employed as a driver for a local courier service and was familiar with the area surrounding the CIA entrance.

The day after the shootings, defendant returned to Pakistan. Two days later, Mir reported to the police that defendant was a "missing person."

On February 8, 1993, the police searched Mir's apartment and discovered the weapon used in the shootings as well as other property of defendant. Defendant had purchased the weapon in Fairfax County three days prior to commission of the crimes.

On February 16, 1993, defendant was indicted for the following offenses arising from the events of January 25th: Capital murder of Darling as part of the same act that killed Bennett, Code § 18.2–31(7); murder of Bennett, Code § 18.2–32; malicious woundings of Starr, Morgan, and Williams, Code § 18.2–51; and five charges of using a firearm in commission of the foregoing felonies, Code § 18.2–53.1.

Nearly four and one-half years later, on June 15, 1997, agents of the Federal Bureau of Investigation (FBI) apprehended defendant in a hotel room in Pakistan. Defendant had been travelling [sic] in Afghanistan during the entire period, except for brief visits to Pakistan.

On June 17, 1997, defendant was flown from Pakistan to Fairfax County in the custody of FBI agents. During the flight, after signing a written rights waiver form, defendant gave an oral and written confession of the crimes to FBI agent Bradley J. Garrett.

Following 15 pretrial hearings, defendant was tried by a single jury during ten days in November 1997 upon his plea of not guilty to the indictments. The jury found defendant guilty of all charges and during the second phase of the bifurcated capital proceeding, fixed defendant's punishment at death based upon the vileness predicate of the capital murder sentencing statute, Code § 19.2–264.4.

On February 4, 1998, after three post-trial hearings, during one of which the trial court considered a probation officer's report, the court sentenced defendant to death for the capital murder. Also, the court sentenced defendant to the following punishment in accord with the jury's verdict: For the first-degree murder of Bennett, life imprisonment and a $100,000 fine; for each of the malicious woundings 20 years', imprisonment and a $100,000 fine; and for the firearms charges, two years in prison for the one charge and four years in prison for each of the remaining four charges. *Kasi*, 508 S.E.2d at 59–60.

## PROCEDURAL BACKGROUND

After the petitioner was convicted and sentenced for his crimes, he promptly appealed to the Supreme Court of Virginia, listing ninety-two assignments of error.[1] In its opinion, the Supreme Court of Virginia dismissed a number of errors on procedural grounds. The court analyzed a number of assignments of error on the merits and ultimately rejected all of them. Accordingly, on November 6, 1998, the petitioner's direct appeal was denied. A petition for rehearing was denied on January 8, 1999, and a petition for writ of certiorari in the United States Supreme Court was denied on June 24, 1999. *Kasi v. Virginia*, 527 U.S. 1038, 119 S.Ct. 2399, 144 L.Ed.2d 798 (1999).

On August 23, 1999, the petitioner filed for writ of habeas corpus in the Supreme Court of Virginia. After resubmitting the petition to comply with the page limit requirements of the court, the petition contained five major categories. Categories I and II concerned the petitioner's arrest, removal from Pakistan, and return to Virginia for trial. Category III dealt with the constitutionality of Virginia's capital murder statute. Category IV addressed a number of issues including the ineffectiveness of trial counsel, the time petitioner was given to prepare his defense, alleged prosecutorial misconduct, Freedom of Information Act requests, and other matters. Finally, Category V concerned ineffective assistance of counsel at trial and on appeal. On January 31, 2000, the Supreme Court

---

1. The R & R only lists ninety-one assignments of error, however, upon review of the record, ninety-two were listed. The "missing" assignment of error from the R & R, "[t]he Circuit Court erred in permitting a camera in the courtroom for the trial of this matter" (assignment number ninety-one), is not relevant to the issues raised on federal habeas review.

of Virginia dismissed a number of petitioner's claims pursuant to the holdings of *Slayton v. Parrigan,* 215 Va. 27, 29, 205 S.E.2d 680, 682 (1974) (holding that a claim that could have been raised at trial or on direct appeal, but was not, is not cognizable on state habeas); *Hawks v. Cox,* 211 Va. 91, 95, 175 S.E.2d 271, 274 (1970) (holding that a claim decided against the petitioner on direct appeal is not cognizable on state habeas); and *Jenkins v. Commonwealth,* 244 Va. 445, 460–61, 423 S.E.2d 360 (1992) (holding that incorporation by reference, without clearly stating the appropriate grounds for the claim, amounts to procedural default). The court also dismissed the petitioner's claims involving ineffective assistance of counsel on the merits. A rehearing was denied on April 21, 2000, and the United States Supreme Court denied certiorari review on October 2, 2000. *Kasi v. Angelone,* 531 U.S. 894, 121 S.Ct. 223, 148 L.Ed.2d 158 (2000).

On May 8, 2000, the Circuit Court of Fairfax County scheduled the petitioner's execution for July 7, 2000. However, on June 28, 2000, a petition was filed for the appointment of counsel for the filing of a petition for writ of habeas corpus in federal court. On July 3, 2000, the petitioner filed an application for stay of execution in federal court, and on July 5, 2000, this court entered a stay of execution, granted petitioner's motion to proceed in forma pauperis, and advised that it would consider the appointment of counsel. On August 15, 2000, counsel was appointed, and on December 11, 2000, the petition for writ of habeas corpus was filed. The petition contained the following four claims:

1. The trial court lacked personal jurisdiction;
2. Petitioner was denied the right of confrontation and cross-examination of Agent Garrett, because the court refused to permit Garrett to be ex-amined with regard to all of his knowledge of the case;
3. Petitioner was improperly denied access to material evidence possibly favorable to his defense by the trial court's refusal to enforce subpoenas served on the FBI, CIA, and other agencies;
4. The trial court compromised petitioner's right to trial by an impartial jury when it refused a defense request for additional *voir dire,* following acquisition of knowledge of the unprovoked killing of four Americans in Pakistan during the trial.

On January 11, 2001, the Director of the Virginia Department of Corrections ("respondent") filed a Rule 5 answer and a motion to dismiss. Magistrate Judge Bradberry issued his R & R on September 12, 2001 recommending that the petition be dismissed and that petitioner be denied a certificate of appealability.

The petitioner has objected to each of the Magistrate Judge's recommendations to deny the claims set forth in his petition for a writ of habeas corpus. Additionally, the respondent has objected to the Magistrate Judge's decision to address the merits of a number of claims, stating that the petitioner is procedurally barred from making such claims. The court, having reviewed the record in its entirety, shall make a *de novo* determination of the portions of the R & R to which the petitioner and respondent object. Pursuant to 28 U.S.C. § 636(b)(1), the court may accept, reject or modify, in whole or in part, the recommendation of the Magistrate Judge, or it may recommit the matter to him with instructions.

## DISCUSSION

I. *Analysis of Procedural Default and Standards of Review*

The respondent has objected to the Magistrate Judge's decision to address the

merits of the petitioner's second and third claims, arguing that he is barred from doing so because the claims have been procedurally defaulted. The respondent relies on the Supreme Court of Virginia opinions on direct appeal and its ruling on the petitioner's state habeas. Thus, before addressing the merits of the petitioner's objections, the court will resolve the respondent's objections.

## A. *Procedural Default*

■ In the R & R, the Magistrate Judge correctly set forth the rule of law that federal courts may not entertain a federal habeas petition unless the petitioner has previously complied with the state procedures in exhausting state remedies. *See Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). The rule, known as "the adequate and independent state grounds rule," is such that if the state reviewing court denies a petitioner's claim based on a rule of default regularly applied in state court, then the petitioner cannot obtain federal review on the correlative federal claim. *Id.; see also Burket v. Angelone,* 208 F.3d 172, 188 (4th Cir.2000). As the Supreme Court has noted, without such a rule federal habeas proceedings would offer a state prisoner the opportunity to undermine the state enforcement of its rules and laws. *Coleman v. Thompson,* 501 U.S. 722, 730–31, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Therefore, absent a showing of cause and prejudice or actual innocence, the federal court will dismiss with prejudice a claim that has been procedurally defaulted in state proceedings. *See Burket,* 208 F.3d at 183; *Wright v. Angelone,* 151 F.3d 151, 159 (4th Cir.1998).

■ As stated above, two separate rules of procedural default were applied by the Supreme Court of Virginia in the petition-er's state habeas proceedings. First, the Supreme Court dismissed claims pursuant to *Slayton,* 205 S.E.2d at 682 (barring state habeas review where the claim was not raised at the trial or on direct review). Second, the Supreme Court dismissed claims under the doctrine in *Hawks,* 175 S.E.2d at 274 (barring state habeas review when a claim was decided against the petitioner on direct appeal). However, based on this court's review of the record, it appears that the Magistrate Judge was correct in stating that the petitioner's claims were not procedurally defaulted for two reasons. First, the issues presently raised on federal habeas review were raised on direct appeal by the petitioner. In fact, at least one of the issues (claim one—trial court lacked jurisdiction) was addressed at length on the merits by the Virginia Supreme Court on direct appeal. *See Kasi,* 508 S.E.2d at 62–64. Second, the petitioner has exhausted his present claims as he has "fairly presented the substance of [them] to the state's highest court." *Burket,* 208 F.3d at 183, n. 11. Therefore, based on these reasons, this court agrees with the Magistrate Judge's R & R that it may properly address the merits of the petitioner's claims on federal habeas review.

## B. *The AEDPA Standard of Review*

■ The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") supplies the standard for determining whether a writ of habeas corpus should be granted and, therefore, whether the R & R should be rejected, modified, or recommitted with instructions. *See* 28 U.S.C. § 2254(d) (West Supp.2001). The AEDPA is applicable in this case because the federal petition was filed after April 24, 1996, the enactment date of the AEDPA. *See Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).[2] The

---

**2.** The specific provision of § 107 of the AED-PA, however, is not applicable. Although

§ 107 contains several provisions pertaining specifically to capital defendants, these provi-

AEDPA standard provides that:

> An application for a writ of habeas corpus ·on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As the Fourth Circuit has recently explained,

> The Supreme Court has recently addressed this standard of review, and it has determined that a state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). According to the Supreme Court, a state court decision unreasonably applies clearly established federal law if, despite correctly identifying the governing legal principle, it "unreasonably applies that principle to the facts of the prisoner's case." *Id.*

*Burch v. Corcoran,* 273 F.3d 577, 583 (4th Cir.2001), *see also Bell v. Jarvis,* 236 F.3d 149 (4th Cir.2000).

Therefore, because the court agrees with the Magistrate Judge's decision that the petitioner's claims are not procedurally defaulted, the respondent's objections are overruled. Using the above standards, the court will turn to the merits of the petitioner's claims and his objections to the R & R.

## II. *Petitioner's Claims and the Findings of Facts and Conclusions of Law in the R & R*

### A. *Claim 1—Jurisdiction over the Petitioner*

■ In claim one, the petitioner asserts that the Virginia trial court lacked personal jurisdiction over him based on the method ·of his removal from Pakistan and return to the United States. Specifically, the petitioner argues that his abduction from Pakistan violated the extradition treaty in effect between the United States and Pakistan. The Magistrate Judge found that the petitioner's claim was without merit, based on the Supreme Court case of *Ker v. Illinois* and its progeny. 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 · (1952); *United States v. Alvarez–Machain,* 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992). The petitioner objects to the Magistrate Judge's reliance on this case law, stating that his case can be distinguished based on the language of the extradition treaty between Pakistan and the United States, as well as the actions of the United States prior to his abduction.

A brief summary of the facts surrounding this issue is helpful in addressing the petitioner's objections. On June 15, 1997, the FBI apprehended the petitioner in a hotel room in Pakistan and transported him in a vehicle for about an hour to board

---

sions are applicable only if the state meets the "opt-in" requirements set forth in § 107. Virginia does not meet the qualifications of

§ 107, (Mem. Op. and Order, 2/26/01), thus precluding its applicability to this case. ·

an airplane. The ensuing flight lasted a little over an hour, at which time the petitioner was transferred to a vehicle for a forty-minute drive to a holding facility, where he was turned over to Pakistani authorities. Late in the day on June 16, 1997, Agent Garrett of the FBI was advised by an official at the U.S. Embassy in Pakistan that the petitioner would be released in the morning. Subsequently, on the morning of June 17, 1997, the petitioner was placed on an airplane and transported to the United States. After the twelve-hour flight to the United States, the petitioner was turned over to the Fairfax County law enforcement officials. *See Kasi,* 508 S.E.2d at 60–61.

In his R & R, the Magistrate Judge provides a thorough and in-depth analysis of the Supreme Court case law involving forcible abductions of individuals from foreign countries where extradition treaties were in effect. The Supreme Court's most recent case on this issue is particularly applicable here. *See Alvarez–Machain,* 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441. In *Alvarez–Machain,* the defendant argued that the state trial court lacked personal jurisdiction over him because he was forcibly abducted from his homeland of Mexico by United States DEA agents, in violation of the extradition treaty between Mexico and the United States. The Court held that the defendant's "abduction was not in violation of the extradition treaty.... The fact of [defendant's] forcible abduction does not therefore prohibit his trial in a court in the United States for violations of the criminal laws of the United States." *Id.* at 669–70, 112 S.Ct. 2188. In making its ruling, the Court reasoned that the treaty "does not purport to specify the only way in which one country may gain custody of a national of the other

country for the purposes of prosecution.... [T]he language of the treaty...does not support the proposition that the treaty prohibits abductions outside its terms." *Id.* at 664–66, 112 S.Ct. 2188.

The Magistrate Judge stated that based on this reasoning, the petitioner's argument that the Fairfax Circuit Court lacked jurisdiction over him must fail. While the petitioner is correct in stating that the treaty in existence between the United States and Pakistan provides a formal mechanism for extradition, the petitioner was not removed from Pakistan under the terms of the treaty. Even assuming that the United States had initiated formal extradition proceedings with Pakistan, as the petitioner argues, no action was taken pursuant to the extradition treaty. *See, e.g., United States v. Chapa–Garza,* 62 F.3d 118, 120–21 (5th Cir.1995) (holding that "[t]he fact that extradition proceedings had been initiated against [the defendant] is irrelevant in view of the Supreme Court's holding that extradition treaty does not govern the legality of forced abductions"). Therefore, the Fairfax Circuit Court had proper jurisdiction over the petitioner.

In a further attempt to provide case law supporting his proposition that his removal from Pakistan violated the extradition treaty, the petitioner has submitted a case from the Constitutional Court of South Africa. *See Mohamed, et al. v. President of the Republic of South Africa,* (decided May 28, 2001), Dkt. 41.[3] In that case, the Constitutional Court held that the delivery of Mohamed into custody of American FBI agents by South African officials, without securing an assurance that he would not be subject to the death penalty as is required by the extradition treaty, was a violation of South African constitutional

---

**3.** The Magistrate Judge did not address this case since the petitioner did not submit it until after the R & R was issued. However, this court will briefly address it here as the petitioner cited the case in his objections to the R & R.

and statutory law. The petitioner contends that because the details of this case are extremely similar to his case, this court should consider this case in making its ruling. However, what the petitioner fails to address is how the Southern District of New York, the court which, at the time the South African Court issued this opinion, was in the midst of the penalty phase proceedings for Mohamed's role in the bombing of United States embassies in Africa, handled this issue. The Southern District of New York held that "as a general rule, the manner by which a defendant is brought before a court does not affect that court's proper assertion of jurisdiction in criminal cases." *United States v. Bin Laden*, 156 F.Supp.2d 359, 366 (S.D.N.Y. 2001), *citing Ker*, 119 U.S. at 444, 7 S.Ct. 225 and *Frisbie*, 342 U.S. at 522, 72 S.Ct. 509. In denying Mohamed the relief he sought, the court ruled that "[t]here is no provision in the treaty that expressly prohibits the procedures followed in this case and no statement that the procedures outlined in the treaty were the sole means of transferring custody of a suspected criminal." *Id.* Similarly in the present case, there is no provision in the treaty that expressly prohibits the procedures followed nor is there a statement that the procedures in the treaty are the sole means of extradition.[4] Therefore, this

case from the Constitutional Court of South Africa does not lend support for the petitioner's case.

■ As stated in the Magistrate Judge's R & R, the Supreme Court of Virginia correctly relied on *Alvarez–Machain* in arriving at its conclusion that the Circuit Court of Fairfax County had proper jurisdiction over the petitioner. *Kasi*, 508 S.E.2d at 63. Its ruling was neither contrary to, nor an unreasonable application, of clearly established federal law, and therefore this court cannot grant federal habeas relief. As a result, the Court AFFIRMS the Magistrate Judge's recommendation, and claim one is hereby DISMISSED.

**B.** *Claim 2—Right of Confrontation and Cross–Examination*

In claim two, the petitioner argues that he was denied the right of confrontation and cross-examination of Agent Garrett, one of the FBI agents who seized him in Pakistan, because the court refused to force the agent to testify as to classified information. The petitioner contends that when Agent Garrett was questioned about certain specific information surrounding abduction of the petitioner from Pakistan, he refused to answer because of the classified nature of the information.[5] Upon the

---

4. The petitioner argues that the United States–Pakistan extradition treaty does in fact contain a statement that the procedures in the treaty are the sole means of extradition, citing Article 8 which states that "[t]he extradition of fugitive criminals under the provisions of this Treaty *shall* be carried out in the United States and in the territory of His Britannic Majesty respectively, in conformity with the laws regulating extradition for the time being in force in the territory from which the surrender of the fugitive criminal is claimed." Pet. for Writ of Habeas Corpus, Dkt. 22, Ex. B. However, as stated above, this refers to all actions taken under the treaty. The petitioner was not removed from Pakistan under this treaty. Furthermore, this treaty does not ex-

plicitly prohibit the procedures followed in this case.

5. The information that the petitioner was unable to obtain based on this reasoning includes the identity of the foreign nationals who were present at any stage of petitioner's seizure or detention in Pakistan; the name and location of the hotel in Pakistan where petitioner was apprehended; the types of aircraft used to move petitioner in country and to return him to the United States; the identity of local officials who helped move petitioner; the identity of local officials or employees who maintained the holding facility where petitioner was kept between June 15 and June 17, 1997; and the identity of the government

trial court's initial determination that the agent answer the questions, the government explained that some of the material might not be admissible at trial pursuant to the Classified Information Procedures Act (CIPA) because it was considered "classified" for security or other relevant governmental reasons.[6] After the trial judge conducted an *in camera, ex parte* hearing with Agent Garret, he decided that the material was of a classified nature and would not be revealed.

■ On direct appeal, the Supreme Court of Virginia dismissed this claim as having no merit. *Kasi,* 256 Va. at 413–14, 508 S.E.2d 57. However, the court failed to state its reasoning behind the dismissal. "When the state court fails to articulate the rationale behind its ruling, [a federal court] must independently review the record and applicable law.... However, this independent review...must be distinguished from a *de novo* review of the petitioner's claims and from a requirement that [the court] make an independent determination on the merits of those claims." *Bell v. Jarvis,* 236 F.3d 149, 163 (4th Cir. 2000) (overruling a prior Fourth Circuit case which held that when a state court does not articulate its reasoning, that a federal court must make an independent determination on the merits).[7] With the appropriate standard of review in mind,

the court turns to petitioner's objections to the R & R.

■ The petitioner objects to the Magistrate Judge's refusal to require an evidentiary hearing so that the petitioner can fully examine Agent Garrett to determine the extent of the involvement of the FBI, the Government of Pakistan, and others in his abduction from Pakistan. However, as the Magistrate Judge states, the petitioner made no credible presentation that the outcome of his case would have been different had he been able to question Agent Garrett in the areas which were precluded. The Fourth Circuit has held that "[t]he defendant must come forward with something more than speculation as to the usefulness of such disclosure." *United States v. Smith,* 780 F.2d 1102 (4th Cir.1985); *see also, United States v. Yunis,* 867 F.2d 617, 624 (D.C.Cir.1989), *quoting United States v. Valenzuela–Bernal,* 458 U.S. 858, 874, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (stating that disclosing evidence based on a defendant's " 'conceivable benefit' is not sufficient," rather the court should determine whether there is "a reasonable likelihood that the [disclosure] could have affected the judgment of the trier of fact"); *Hall v. United States,* 30 F.Supp.2d 883, 900 (E.D.Va.1998) (holding that the burden is on the defendant to show that disclosure "will significantly aid his defense").

officials who permitted the FBI to take petitioner out of country. *See* R & R, p. 36.

6. CIPA provides that "at any time after the filing of the indictment or information, any party may move for a pretrial conference to consider matters relating to classified information that may arise in connection with the prosecution. Following such a motion, ... the court shall promptly hold a pretrial conference to establish the timing of requests for discovery...." 18 U.S.C. app. 3, § 2 (West 2000). Furthermore, CIPA allows for *in camera, ex parte* review of classified material upon request of the United States. *Id.* at § 4; *see also United States v. Klimavicius–Viloria,* 144

F.3d 1249, 1261–62 (9th Cir.1998) (holding that "an *ex parte* hearing does not violate a defendant's right to be present at all stages of a trial" because "the question of whether to protect classified information under CIPA is a question of law within the meaning of [Federal Rule of Criminal Procedure] 43.")

7. The court notes that the petitioner objects to the use of standard articulated in *Bell,* stating that it was wrongly decided and fundamentally inconsistent with *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). However, this court is bound by the law of this circuit.

As the Magistrate Judge discussed in his R & R, once the government raised the CIPA issue, the trial judge conducted an *in camera, ex parte* hearing with the agent to determine the nature of his testimony and the reasons for nondisclosure.[8] After this hearing, the trial judge prepared a note which was included in the file, under seal. The note has since been opened and made available to all parties and states, quite simply:

> Agent Garrett told me that the CIA has developed confidential contacts in Pakistan whose identity would be compromised if the questions continued along lines of who was present. He also told me that the very sensitive nature of the relation of the government in Pakistan would [make] the revelation of specifics of how the government cooperated with the FBI dangerous to reveal, and reminded me of the riots that erupted when Mr. Horan made a statement earlier.

R & R, p. 38. Thus, it appears from the statement of the trial court that all of the issues which were addressed *in camera* had to do with actions and activities of citizens of Pakistan, none of whom dealt directly with petitioner after he was taken into custody by Garrett and the other agents. As such, the petitioner has failed to make a showing that the information sought from Agent Garrett would have affected the judgment of the jury in this case. Therefore, the Supreme Court of Virginia's dismissal of this claim was not contrary to, or an unreasonable application of, clearly established federal law. The Court therefore AFFIRMS the Magistrate Judge's recommendation, and claim two is hereby DISMISSED.

### C. Claim 3—Right to Subpoenaed Material

In his third claim, the petitioner contends that he was denied access to material evidence because of the trial court's refusal to enforce subpoenas served on the FBI, CIA and other federal agencies. As in claim two, the Supreme Court of Virginia failed to state its rationale behind dismissing this claim as having no merit on direct appeal. *Kasi*, 256 Va. at 413–14, 508 S.E.2d 57. Therefore, in accordance with the standard of review set forth in *Bell*, this court independently reviews the record and applicable law to determine if the Virginia Supreme Court's holding was contrary to, or an unreasonable application of, clearly established federal law. 236 F.3d at 163.

Petitioner states that the FBI, CIA and other federal agencies conducted extensive investigations on the petitioner and compiled numerous documents, tapes and discs. *See generally, Kansi v. United States Dep't of Justice*, 11 F.Supp.2d 42, 43 (D.D.C.1998) (stating that the FBI identified 14,281 pages of documents, including sub-files, exhibits, cassettes, and optical discs in response to the petitioner's FOIA request). The petitioner argues that when this information was subpoenaed, because he believed that some of the information was "possibly favorable" to his defense, the state court's refusal to enforce such

---

**8.** While the Magistrate Judge is correct in stating that the formal CIPA procedures were not followed in this case, thereby doing a disservice to the trial judge, the importance of the government's privilege in protecting national security has long been recognized by the judiciary. *See Yunis*, 867 F.2d at 622–23 (discussing a number of Supreme Court cases upholding the government's compelling interest in protecting certain classified information); *Smith*, 780 F.2d at 1108 (4th Cir.1985) ("The government has a substantial interest in protecting sensitive sources and methods of gathering information."). Therefore, the lack of formal CIPA proceedings should not prevent the government from withholding the information determined to be classified.

subpoenas violated his Sixth and Fourteenth Amendment rights, as well as the principles dictated by the Supreme Court in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).[9] However, as the Magistrate Judge states, this argument is predicated on many erroneous assumptions.

■■■ First, there is no general rule to discovery in a criminal case, even in capital cases. *See United States v. LaRouche,* 896 F.2d 815, 826 (4th Cir.1990); *Walker v. Commonwealth,* 258 Va. 54, 63, 515 S.E.2d 565, 570 (1999). Furthermore, as the Supreme Court has repeatedly held, *Brady* did not create a constitutional right to discovery in a criminal case. *Ritchie,* 480 U.S. at 59, 107 S.Ct. 989. Federal and state rules provide for limited access to materials that would normally and ordinarily be essential to the preparation of a defense such as statements by the accused, fingerprint analysis, and a summary of expected expert testimony. *See generally,* Rules of the Supreme Court of Virginia,

3A:11(b)(1) and (2); Fed.R.Crim.P. 16. However, as correctly stated in the R & R, the sovereign reserves the right to deny, restrict, defer, or otherwise adjust requested discovery. *See* Rules of the Supreme Court of Virginia, 3A:11(f); Fed. R.Crim.P. 16(d)(1).

Second, as both the Supreme Court and Fourth Circuit have held, federal agents have the right to refuse to obey a subpoena duces tecum under the Housekeeping Statute.[10] *See United States ex rel. Touhy v. Ragen,* 340 U.S. 462, 468, 71 S.Ct. 416, 95 L.Ed. 417 (1951); *Smith v. Cromer,* 159 F.3d 875, 878 (4th Cir.1998). The Department of Justice, in accordance with this statute, promulgated regulations governing the disclosure of materials contained in its files.[11] In *Smith,* the Fourth Circuit addressed a situation similar to the present issue. There, a state defendant subpoenaed two assistant United States attorneys and a special agent with the Drug Enforcement Administration seeking to compel both their testimony and the production of documents. The government removed the case to federal court and had

**9.** It is important to note that the petitioner was not denied all access to information contained by the FBI. As stated in the R & R, Agent Garrett was made available to the petitioner for questioning on two occasions—at the pretrial proceeding addressing testimony of government witnesses and at trial. The Fourth Circuit has approved of a district court's consideration of the opportunity to cross-examine federal agents in deciding whether the defendant has established sufficient cause to order disclosure. *Smith v. Cromer,* 159 F.3d 875, 882 (4th Cir.1998); *see also Ritchie,* 480 U.S. at 54, 107 S.Ct. 989 (finding no violation of the Confrontation Clause for failing to disclose confidential file "[b]ecause defense counsel was able to cross-examine all of the trial witnesses..."). Moreover, the petitioner here was able to gather some information via the Freedom of Information Act. *See Kansi,* 11 F.Supp.2d at 43.

**10.** "The head of an Executive department ... may prescribe regulations for the government

of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public." 5 U.S.C. § 301 (West 1996).

**11.** "In any federal or state case or matter in which the United States is not a party, no employee...of the Department of Justice shall, in response to a demand, produce any material contained in the files of the Department, or disclose any information relating to or based upon material contained in the files of the Department, or disclose any information or produce any material acquired as part of the performance of that person's official duties or because of that person's official status without prior approval of the proper Department official...." 28 C.F.R. § 16.22(a) (2001).

the subpoenas quashed after the state court ordered the production of the documents. The Fourth Circuit, in affirming the district court's decision to quash the subpoenas, stated that "a state court...lacked jurisdiction to compel a federal employee to testify concerning information acquired during the course of his official duties...." *Smith*, 159 F.3d at 879, *citing Boron Oil Co. v. Downie*, 873 F.2d 67, 69–71 (4th Cir.1989). Furthermore, the Fourth Circuit, in quoting the Supreme Court, held that "pursuant to such regulations, which wisely centralize disclosure decisions in superior Justice Department officials, subordinate employees 'may *lawfully* decline to produce [records] in response to a subpoena *duces tecum*.'" *Id.* at 880, *quoting Touhy*, 340 U.S. at 467, 71 S.Ct. 416 (emphasis and brackets in original).

As the Magistrate Judge stated, the *Smith* decision is important for two reasons. First, "it is clear that there are limits upon the due process which is accorded a defendant in presenting his defense and further that their right to compulsory process is not absolute." *Id.* at 882, *citing Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) *and Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40. Second, the court acknowledged that balancing must be done when a defendant in a state court proceeding seeks information in a government file that may be helpful to his defense, emphasizing that the federal sovereign has the right to require the defendant to establish cause to believe that facts of a specific nature or type, which will aid his defense, are present in the file. *Id.* at 882 and 883, n. 2 (the defendant "was required to come forward with something more than speculation as to usefulness of ... disclosure."). In his state habeas petition, the petitioner did not provide a single suggestion of a single fact present in the government's files which would go to the issue of his guilt or inno-

cence, or the punishment imposed upon him. The Virginia Supreme Court's dismissal of this claim therefore was not contrary to, or an unreasonable application of, clearly established federal law. As such, the court ADOPTS the Magistrate Judge's recommendation and hereby DISMISSES claim three.

D. *Claim 4—Right to an Impartial Jury*

In his final claim, the petitioner maintains that his right to trial by an impartial jury was compromised based on decisions of the trial court not to declare a mistrial or conduct individual *voir dire* during the penalty phase of the trial. Specifically, the petitioner argues that the court denied his request to conduct individual *voir dire* with the jurors after (1) the jury submitted a note inquiring about safety concerns; (2) one juror heard a news report stating that four Americans had been killed in Pakistan the day following the guilty verdict in this case; and (3) sequestering the jury after the penalty phase had begun. The petitioner objects to the Magistrate Judge's recommendation that this claim be dismissed as having no merit, arguing that "special circumstances" existed here that required the trial judge to conduct further *voir dire*.

 As a starting point, it is a well-established principle that the trial court has wide discretion in conducting *voir dire*. *See Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), *quoting Ristaino v. Ross*, 424 U.S. 589, 594, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); *United States v. Barber*, 80 F.3d 964, 967 (4th Cir.1996) ("the trial judge is in the best position to make judgments about the impartiality and credibility of potential jurors based on the judge's own evaluations of demeanor, evidence, and of responses to questions."). "A trial court's finding of

juror impartiality may be overturned only for manifest error." *Mu'Min v. Virginia,* 500 U.S. 415, 428, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991); *see also United States v. Gray,* 47 F.3d 1359, 1367 (4th Cir.1995) (holing that the trial court's "determination of juror competency ... will not be overturned absent clear error"). Furthermore, when a case is tried in state court, a federal court's "authority is limited to enforcing the commands of the United States Constitution." *Mu'Min,* 500 U.S. at 422, 111 S.Ct. 1899 (internal citations omitted).

A brief recitation of the facts surrounding this issue will be helpful in addressing the petitioner's claim. After the jury returned a verdict of guilty on all counts, they submitted a note asking the court if there were any safety precautions of which they needed to be aware. The judge asked the government and the defense how they best thought the situation should be addressed. After receiving opposing views from the parties,[12] the judge brought the jury in and carefully advised them that the steps which had been taken with regard to security were consistent with high profile or capital cases that were tried, and that the court was not aware of any particular danger or risk they faced. However, the situation changed two days later after the death of four Americans in Pakistan was linked to the guilty verdict in this trial. At that time, the defense once again asked the court to conduct individual *voir dire* of the jurors. When the court refused, the defense asked for an immediate mistrial, which the court again denied. In an attempt to not draw attention to the news story, the court decided to begin the day with its usual "good morning" routine, inquiring whether any of the jurors had seen or heard about the case in general. Upon a unanimous "no" from the jury, the court moved on with the penalty phase of trial.

Following the release of the jury, the court decided that due to the opinion-shaping nature of the reporting on the case, it would sequester the jury for the remainder of the trial. After informing the jurors of this, and releasing them to collect their things from their homes, the court received a note from Juror 31, stating that the juror, upon awaking that morning, heard the National Public Radio announcer state that Americans were shot and killed in Pakistan before she could turn the radio off. The juror indicated that she wasn't sure the matter was related to the case, which is why she did not raise the matter at the beginning of the day's testimony. However, since the jury was being sequestered, the juror considered the fact that it might be, and she felt the court should be advised. The defense then moved for an immediate mistrial, which the court denied. The juror was brought in for questioning and she explained to the court why she had not related to the court, in the morning, her experience of awakening to the radio report. Upon further inquiry by the court, she stated that it would not have any affect on her ability to be fair and impartial, noting that she did not hear the whole news story. Further, she had not discussed what she heard with any other jurors. After questioning the juror, defense counsel renewed motions for individual *voir dire* of the jurors and a mistrial. The motion for a mistrial was promptly denied. In response to the parties' suggestions as to how the court should address the issue with the jury, the court noted that there was "no indication from any juror that they have this great fear that [the defense] is talking about ... and I think to bring them individually

---

12. The Commonwealth did not wish to alarm or disturb the jury while the defense asked that the court conduct individual *voir dire* with the jurors or declare a mistrial.

would unduly delay your getting on with your evidence." (11/12/97 Tr. at 193).

In examining the trial court's conduct, the court agrees with the Magistrate Judge. As he stated in the R & R, the trial court was concerned for petitioner's right to have an independent jury consider and decide his case. The questions posed to Juror 31 and her responses reflected that she understood what her duty as a juror was and was willing to abide by the instructions previously given to her by the court. She expressed that she had not dwelled on the news story as she was paying attention to witnesses and evidence during the day's proceedings. Furthermore, the earlier question by the jurors with regard to security measures merely reflected a collective concern about the corporate safety of all of the members of their body. They asked the court for guidance since they looked to the court to provide their basic needs with regard to information and security during the course of the trial. There is not a single aspect of this trial from start to finish through all 3,000 pages of testimony that reflects anything other than a concern that petitioner be exposed to a fair and impartial jury and have a fair and impartial trial.

Finally, there has been no evidence presented to either the state court or this court that any member of the jury, other than Juror 31, heard any information about the death of the four Americans in Pakistan. In the absence of some showing that the jury had been exposed to the information, the concerns of defense counsel constitute little more than speculation. The court had been through over a week of trial, and without anything more from the defense on potential jury contamination, it was not unreasonable for the court to refuse to declare a mistrial or alarm the jurors with individual *voir dire*. Upon independent review of the record, it does not appear to this court that the trial

judge made any manifest errors in handling *voir dire*, either at the start of the jury selection process nor in questioning the jurors at various stages of the guilt and penalty phases of the trial. Thus, the ruling of the Supreme Court of Virginia, that the trial court did not abuse its discretion, was not contrary to, nor an unreasonable application of, clearly established federal law. As such, the court ADOPTS the Magistrate Judge's recommendation and DISMISSES claim four.

### E. Ineffective Assistance of Counsel

The petitioner also objects to the failure of the Magistrate Judge to address his ineffective assistance of counsel claims. Upon review of the petition, it appears that the petitioner raised the issue of ineffective assistance of counsel on appeal as sub-parts to claims two and four. Moreover, the petitioner did raise this claim on state habeas review, whereby it was dismissed on the merits. Therefore, this court may review it to determine whether the Supreme Court of Virginia's dismissal was contrary to, or an unreasonable application of, federal law.

The Sixth Amendment provides in relevant part: "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence [sic]." U.S. Const., amend. VI. The Sixth Amendment right to counsel includes the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish a claim for ineffective assistance of counsel, a defendant must prove both (1) that his attorney's conduct fell below an objective standard of reasonableness, and (2) that the attorney's deficient performance caused him prejudice. *Strickland*, 466 U.S. at 687–91, 104 S.Ct. 2052. Prejudice is defined as "a reasonable probability that, but

for counsel's unprofessional conduct, the result of the proceedings would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

 Under *Strickland,* "there exists a strong presumption that counsel's conduct was within a wide range of reasonably professional conduct, and courts must be highly deferential in scrutinizing counsel's performance." *Kratsas v. United States,* 102 F.Supp.2d 320, 322 (D.Md. 2000), *aff'd* 9 Fed.Appx. 107 (4th Cir.2001), *citing Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052. Furthermore, the court need not make a determination concerning the attorney's performance under the first prong of the *Strickland* test where it is clear that no prejudice would have resulted even if the attorney's representation had been deficient. *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052.

 In this case, the petitioner's trial and appellate counsel were diligent and thorough. As the Magistrate Judge noted, trial counsel filed fifteen pretrial motions and three post-trial motions, in addition to presenting a complete case over the ten-day trial. Appellate counsel cited ninety-two assignments of error for appeal to the Supreme Court of Virginia. There is no indication from the record that the petitioner's counsel's performance was deficient. While the Magistrate Judge's R & R does cite to one error of defense counsel, failure to follow formal CIPA procedures, there is no indication that this error prejudiced the petitioner in any way. Furthermore, the petitioner has presented insufficient evidence to show how but for this error, or any other alleged errors, the result of the proceedings would have been different. Therefore, the court finds that the Supreme Court of Virginia did not rule contrary to federal law when dismissing petitioner's ineffective assistance of counsel claims. As a result, this court DISMISSES petitioner's claims of ineffective assistance of counsel.

### III. *Certificate of Appealability*

 In his R & R, the Magistrate Judge recommended that this court decline to issue any certificate of appealability ("COA"). The petitioner objects to this recommendation as premature since he has not yet applied for such a certificate. The Fourth Circuit has held that "[t]o be entitled to a certificate of appealability, the petitioner must make 'a substantial showing of the denial of a constitutional right.'" *Beck v. Angelone,* 261 F.3d 377, 386 (4th Cir.2001), *quoting* 28 U.S.C. § 2253(c)(2). The court continued that "[t]o make the required showing, the petitioner must demonstrate that 'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" *Id., quoting Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (internal citations omitted). Furthermore, "it is perfectly lawful for the district court to deny COA *sua sponte* [because] [t]he statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued." *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir.2000). Upon reviewing all of the petitioner's claims, the court finds that the petitioner has failed to show that reasonable jurists could debate over the resolution of the petition or that the issues were adequate to deserve encouragement to appeal. Thus, the court ADOPTS the Magistrate Judge's recommendation, and DENIES the petitioner a certificate of appealability.

## CONCLUSION

The court, having examined the objections to the Magistrate Judge's R & R and having reviewed the record and made *de novo* findings with respect to the portions objected to, hereby OVERRULES all of the petitioner's and respondent's objections. The court ORDERS that the petition be DENIED and DISMISSED in its entirety.

The Clerk is DIRECTED to mail a copy of this Order and Opinion to counsel for the petitioner and counsel for the respondent.

It is so ORDERED.